217. November 21, 1995: Plaintiff files an application for a special permit with the ZBA, to add a balcony on the south side of the house under construction, on the second floor, size 5' by 12'.

218. December 19, 1995: Scheduled public hearing takes place despite a snow storm. Plaintiff's opponent from the HCC, Humphrey Sutton, is also present.

219. Benjamin Haller, chairman of the ZBA and friend of Humphrey Sutton, denies the application by applying the wrong statute (M.G.L., c.40A,s.10 instead of M.G.L., c.40A,s.6), ignoring the preexisting nonconforming nature of the structure, and plaintiff's rights under the so-called "grandfather clause."

220. Benjamin Haller knew or should have known, that plaintiff's property was under the protection of the so called "grandfather clause".

221. Benjamn Haller was a longtime member of the ZBA and a lawyer by profession.

222. December 29, 1995: ZBA sends written denial to plaintiff on his petition to construct a balcony on his cottage.

223. January 16, 1996: Plaintiff files "pro se" complaint against ZBA and challenges the decision of the ZBA, Superior Court, civil action number HDCV1996-71.

224. January 16, 1996: Plaintiff sends letter to the State Board of Examiners of Electricians, Commonwealth of Massachusetts, asking their opinion on the utility trench in the lake bed, challenging the electrical inspector's (Richard Blease) misconstrued interpretation of the Electrical Code, denying plaintiff his right to underground service to his cottage.

225. February 1, 1996: ZBA, (defendant's) attorney, Vincent McCaughey, files his answer and counter claim to plaintiff's complaint against the ZBA.

226. February 20, 1996: Plaintiff files answer to counter claim.

227. April 4, 1996: Plaintiff receives a phone call from Minth Tonthat, DEP. Mr. Tonthat confirms that plaintiff is allowed to dig trench for underground service through the lake bed.

228. April 5, 1996: Letter from the Board of State Examiners of Electricians stating:

> "In my opinion this installation appears to be in compliance with the Massachusetts Electrical Code," signed by James Roger, Executive Secretary.

229. April 30: 1996: HCC meeting canceled.

230. May 7, 1996: Plaintiff is attending the HCC meeting. Humphrey Sutton refuses to amend NOI to include utility trench, steps in front of house, and concrete pier foundation for propane gas tank. He requests plaintiff to excavate and remove the four buried conduits for underground service of power and other utilities, due to alleged violation of zoning bylaws.

231. May 13, 1996: HCC is inspecting the proposed steps and the concrete pier foundation for the propane gas tank.

232. July 10, 1996: Plaintiff seeks professional help to cope with extreme mental and emotional distress due to stress in conjunction with his ongoing "pro se" lawsuit in Superior Court against the ZBA, the ongoing harassment and discrimination by the HCC, the ongoing harassment and discrimination by the electrical inspector, and the ongoing conspiracy by some of the town officials. On this day, plaintiff attends therapy session with Rocco Marino, Ph.D., Sturbridge Human Services, 450 Main Street, Sturbridge, MA 01566.

233. July 17, 1996: Plaintiff attends another therapy session with Rocco Marino, Ph.D., to cope with extreme mental and emotional distress.

234. July 30, 1996: Plaintiff attends another therapy session with Rocco Marino, Ph.D., to cope with extreme mental and emotional distress.

235. August 8, 1996: Plaintiff attends another therapy session with Rocco Marino, Ph.D., to cope with extreme mental and emotional distress.

236. August 26, 1996: Plaintiff files "Plaintiff's request for production of documents from the ZBA, defendant(s).

237. September 2, 1996: Plaintiff files a petition for a special permit to obtain a building permit for a two-story garage on his preexisting nonconforming lot, dated August 30, 1996.

238. September 3, 1996: Plaintiff files a Memorandum "PRINCIPAL POINTS IN DETAIL UPON WHICH APPLICATION HAS BEEN MADE FOR VARIANCE SO AS TO PERMIT CONSTRUCTION OF A TWO-STORY GARAGE" in support of his petition for a special permit for a two-story garage.

239. September 3, 1996: Plaintiff is attending a meeting with the BOH regarding the connection of the proposed two-story garage to the existing subsurface sewage disposal system.

240. BOH members question the necessity of plumbing in this building. They also wanted to know the distance between the foundation of the proposed two-story garage and the leach field.

241. After plaintiff answers their questions, BOH members are signing the procedure sheet, consenting to the proposed hook-up of the two-story garage to the existing subsurface sewage disposal system.

242. September 3, 1996: Plaintiff files his NOI 184-118, on the proposed two-story garage, foundation for propane gas tank, trench through the lake bed for underground service, steps in front of house, shed, and two-story garage, retaining wall, and to pave driveway with cobblestone.

243. September 3, 1996: HCC refuses to issue receipt for plaintiff's NOI, as mandated by M.G.L., c.131,s.40.

244. September 7, 1996: Plaintiff attends another therapy session with Rocco Marino, Ph.D., to cope with extreme mental and emotional distress.

245. September 17, 1996: DEP issues file number 184-118, on NOI filed on September 3, 1996.

246. September 23, 1996: Plaintiff files a plot plan and a plan giving the dimensions of the two-story garage, in support of his petition for a special permit for a two-story garage with the ZBA.

247. September 24, 1996: Public Hearing on NOI with HCC. Humphrey Sutton raises all kinds of capricious, arbitrary issues; he requests that plaintiff combine all plans and put all plans onto one. Humphrey Sutton falsely accuses plaintiff of not having complied with notification requirements of abutters, as mandated pursuant to M.G.L., c.131,s.40.

248. September 25, 1996: Plaintiff requests that the Public hearing will be continued on October 1.

249. September 26, 1996: Letter from HCC stating that without local permits in place and a delineation map, HCC will not continue the public hearing. HCC claims further:

> "HCC will be unable to approve this work unless the installation of such a line has been approved by the relevant inspectors or departments. As these lines were not inspected when installed, we presume that the line will have to be excavated and re-laid."

250. Richard Blease inspected the underground conduit initially. After plaintiff questioned Richard Blease's opinion on the conduit for the power line, he refused to comment or issue the requested, and overdue, permit.

251. In any event, such permits need not to be issued before public hearing on plaintiff's NOI.

252. Humphrey Sutton's refusal to issue order of conditions is in

    violation of 310 CMR 10.05(4)(f), 310 CMR 10.05(5)(b), 310 CMR 10.05(6)(a), and M.G.L., c.131,s.40.

253. September 26, 1996: Tax Collector signs procedure and signature list required to obtain a building permit for the proposed two-story garage.

254. September 30, 1996: HCC (Humphrey Sutton) leaves a message on plaintiff's answering machine, informing plaintiff that HCC will not continue the public hearing scheduled for the next day due to the fact that plaintiff does not have the appropriate permits.

255. This is in violation of M.G.L., c.131,s.40.

256. September 30, 1996: Plaintiff called around to find an attorney to represent plaintiff at the HCC meeting.

257. October 1, 1996: Public Hearing on the petition for a special permit on for a two-story garage.

258. Plaintiff is accompanied by two lawyers, Bruce Leiter and Brian Harmon. Under overwhelming pressure of two lawyers, Benjamin Haller grants the special permit for the proposed two-story garage.

259. Right after the Public Hearing with the ZBA, the two lawyers accompanying plaintiff, and plaintiff himself, went downstairs to attend the continued public hearing with the HCC. Humphrey Sutton, chairman of HCC and personal friend of Benjamin Haller, was in disbelief when he learned that his friend Benjamin Haller granted the special permit.

260. October 1, 1996: HCC minutes to meeting provide:

> 5. Continuance of plaintiff's public hearing. Appearing with Mr. Frei, his attorney Bruce Leiter of Springfield. Plan submitted with all projects noted, but it is not a delineated map of the wetlands. Discussion continues about the power lines under the lake bed. Attorney Leiter does not think we can object until plaintiff has electrical permit. Sites a CMR law. Humphrey disagrees and discussion continues. Objection to map & book number on NOI, plus attached deed is not Peter Frei's. The Atty. says that will be straightened out. The hearing is continued again to Oct. 15, 1996 at 8:00 pm.

261. The request by Humphrey Sutton, chairman, for a delineated map of plaintiff's property is capricious and arbitrary and an unlawful attempt to block plaintiff's project and to harm plaintiff financially.

262. This ridiculous request alone costs plaintiff $6768.12 (six-thousand seven-hundred and sixty-eight dollars and twelve

cents).

263. October 4, 1996: Plaintiff called Richard Blease, electrical inspector, and left message to set up a meeting with plaintiff, plaintiff's attorney Bruce Leiter, and Richard Blease.

264. October 4, 1996: Blease calls back, refuses to meet with attorney Leiter and plaintiff, wants to see a permit application before he does any thing, threatens to bring a state investigator to plaintiff's property.

265. October 4, 1996: Plaintiff's attorney, Bruce Leiter, sends letter to HCC, correcting the record on plaintiff's deed (book 6519, page 178).

266. October 7, 1996: Plaintiff left permit application at door to Richard Blease's residence.

267. October 7, 1996: Plaintiff left message on answering machine asking what the fee would be, asking also that Mr. Blease confirm that he got the permit application.

268. Plaintiff called him with his cellular phone again same day and left message. Richard Blease never returned plaintiff's calls.

269. October 8, 1996: Plaintiff sent Richard Blease a check with the highest fee, $60,- (check number 578), just to make sure.

270. (Richard Blease never endorsed the check; even so, he admitted on the phone with Jim Foley, town selectman, that he got the permit application).

271. October, 1996: Richard Blease, electrical inspector, and Humphrey Sutton, chairman HCC, called Mr. Garon, plaintiff's electrician, and accused him falsely of doing work without a permit.

272. October 8, 1996: Plaintiff called his electrician, Mr. Garon, who told plaintiff that he got a call from the electrical inspector, Richard Blease, and from the chairman of HCC, Humphrey Sutton. They falsely accused him of having done work without a permit.

273. Mr. Garon does work as a self-employed electrician in Holland and surrounding towns and depends on the electrical inspector to inspect and approve his work. Mr. Garon also explained that electrical inspectors of the surrounding towns would know each other and he feared retaliatory actions from these inspectors as well. Intimidated by these phone calls, Mr. Garon was not interested in working with plaintiff any longer.

274. October 8, 1996: Plaintiff finally called Jim Foley, town selectman, to seek help. Plaintiff left message, asking him to call plaintiff back.

275. October 9, 1996: Plaintiff called Blease again, and left another message on his answering machine, relating that plaintiff left the permit on his door on Monday, October 7, 1996, and sent him check on Tuesday, October 8, 1996. The message asked that he call plaintiff back, and if the plaintiff did not hear from him, plaintiff would assume every thing was ok.

276. October 9, 1996: Humphrey Sutton, Helen Kreiger, and another member of the HCC, Carol Dion, resign.

277. October 10, 1996: Plaintiff attends another therapy session with Rocco Marino, Ph.D., to cope with his extreme mental and emotional distress.

278. October 12, 1996: Town sanitarian Arthur Quinn sends letter to BOH, listing 4 items to be examined after submittal of the plan showing the connection of the two-story garage to the existing subsurface sewage disposal system.

279. October 12, 1996: Plaintiff called Brian Roche and learned that there is no HCC meeting on October 15.

280. October 15, 1996: Helen Kreiger withdrew her resignation from the HCC.

281. Plaintiff's attorney, Bruce Leiter, and Phd. Biologist, William Shaheen, are present. They submit Supplementary Notes requested by HCC at meeting on October 1, (delineation map, site plan etc.).

282. October 22, 1996: HCC is meeting with Paul Castonguay as the new chairman. Board members take a vote on plaintiff's NOI application. All four members present vote in favor of 5 out of 6 proposed activities, three members voted in favor of the second proposed activity, (change from overhead to underground service on existing house and proposed two-story garage), Brian Roach voted against the second proposed activity. HCC closes the public hearing which began on September 24, 1995, and will issue order of conditions.

283. November 12, 1996: HCC fails to issue Order of Condition after 21 days as required by M.G.L., c.131,s.40, and 310 CMR 10.05(6)(a), for project file number 184-118.

284. November 26, 1996: After the new chairman's unexpected death, without notifying plaintiff, 35 days after the closing of the public hearing in which the Board voted and accepted plaintiff's NOI in it's entirety, HCC discussed the Order of Conditions due on plaintiff's NOI.

285. Humphrey Sutton, former chairman of HCC and not a member of the HCC at this time, attends this meeting.

286. Humphrey Sutton, former chairman of HCC and not a member of

        HCC at this time, brought typed order of conditions on plaintiff's NOI to this meeting.

287. In said order of conditions, Humphry Sutton falsified unlawfully the votes taken during the official public hearing on October 22, 1996, and denied plaintiff's activities under paragraph 2. (Change from overhead to underground service on existing house, existing shed, and proposed two-story garage) and under paragraph 3. (Construction of foundation for 500 Gallon Propane Tank) as proposed in plaintiff's NOI.

288. There was no quorum present at that meeting of November 26, 1996, to sign the order of conditions. One of the signatures is the signature of a town selectman which was not a member of the HCC at that time. Only two members of the HCC signed the Orders of Conditions.

289. November 26, 1996: ZBA, (defendant), serves "INTERROGATORIES PROPOUNDED BY THE DEFENDANT" to Peter Frei (plaintiff) in the civil action, docket no. 96-71, (balcony on dwelling).

290. December 4, 1996: HCC mails the Order of Conditions, 43 days after closing of the public hearing, a clear violation of M.G.L., c.131,s.40.

291. The Order of Conditions shows filing date of NOI as October 22, 1996, instead of September 3, 1996.

292. The Order of Conditions was written by Humphrey Sutton, ex-chairman but not a member of HCC at that time.

293. The Order of Conditions were written prior to the meeting.

294. Proposed propane gas tank foundation and underground utility line were denied, despite the fact that HCC voted in favor of these two proposed activities at the public hearing on October 22, 1996.

295. Furthermore, the "Order of Conditions" states, "The Town electrical inspector has informed HCC that no application for any permit for any work has been received by him." This is a lie. Jim Foley, town selectmen, questioned the electrical inspector about the permit, and Blease confirmed, that he, in fact, had received plaintiff's electrical permit application but "never processed it."

296. This permit does not need to be issued in order to file a NOI and to get Orders of Conditions issued.

297. The Order of Conditions contains arbitrary and capricious statements concerning safety issues which are outside the scope of authority of the HCC.

298. December 27, 1996: Plaintiff's attorney is filing a request for Superseding Order of Conditions.

299. January 6, 1997: Plaintiff's attorney requests copies of minutes to the HCC meetings held during the months of October and November 1996, according to M.G.L., c.66,s.10.

300. January 10, 1997: Brian Harmon sends "plaintiff's answers to defendant's first set interrogatories" to Vincent McCaughey, attorney of the ZBA, on behalf of Peter Frei (plaintiff). This is part of civil action in Superior Court, docket number HDCV1996-71, (balcony of dwelling).

301. January 23, 1997: DEP denies Superseding Order of Conditions, by following the false arguments of HCC, and not entering the arguments provided by attorney Leiter, in clear violation of the law, (one of the DEP officers, Minth Tonthat, is a friend of former HCC chairman Humphrey Sutton).

302. February 5, 1997: Attorney Leiter is filing the "Notice of claim for adjudicatory appeal" on behalf of plaintiff on HCC's conduct in regards to the order of conditions on plaintiff's NOI with the DEP file number 184-118.

303. April 7, 1997: DEP Boston issues "Pre-hearing Conference Order." The Pre-Hearing Conference is scheduled for June 4, 1997.

304. May 7, 1997: Plaintiff's attorney, Bruce Leiter, sends "Order for Pre-Hearing Conference" to HCC and DEP Springfield. All parties are ordered to attend a meeting to discuss and to try to resolve some or all issues prior to the Pre-Hearing Conference. This meeting is scheduled for May 13, 1997, at 8:00pm.

305. May 12, 1997: Plaintiff delivered by hand, letter from attorney Leiter to HCC member, Helen Kreiger. The letter confirms that HCC is postponing the ordered meeting scheduled for May 13.

306. Humphrey Sutton, who was responsible for writing the unlawful Order of conditions, conveniently planned a business trip to Europe for the week of May 13, 1997. Members of the HCC request the meeting to be postponed to May 20, and demand that Humphrey Sutton be present. Attorney Leiter also orders the tape recordings of the meetings to be made available, recordings of the meetings of October 1, 15, 22, and November 26, 1996.

307. May 15, 1997: Peter Frei (plaintiff) files "MOTION FOR SUMMARY JUDGMENT," in the Superior Court civil action, docket number HDCV1996-71, (balcony on dwelling).

308. May 20, 1997: Pre-Hearing Conference with HCC. Ex-chairman Humphrey Sutton was unable to attend. Humphrey Sutton suffered a severe asthma attack in a hotel in London, Great Britain, and died. Town Selectman Jim Foley attended the meeting together with plaintiff and plaintiff's attorney Bruce Leiter.

309. Brian Roche was still opposed to subsurface conduit. Finally, after attorney Bruce Leiter and plaintiff were asked by Jim Foley, town selectman, to step outside so they could discuss the matter in the absence of plaintiff and his attorney, all members of HCC agreed to accept the NOI in its entirety. HCC would issue an amended Order of Condition, allowing plaintiff the foundation of Propane Gas Tank and subsurface utility lines.

310. The recording of this meeting was erased by unknown.

311. May 27, 1997: Plaintiff's attorney files motion to continue the Pre-Hearing Conference with the Office of Administrative Appeals of the DEP, in anticipation of settlement.

312. May 28, 1997: Plaintiff's attorney, Bruce Leiter, sends letter to plaintiff, informing him that Betsy Kimball, a DEP attorney with the Western Region Office, has no issue with plaintiff's anticipated work.

313. June 4, 1997: HCC is issuing amended Order of Conditions. Quote:

> "The installation of power lines in the lake-bed and the foundation work for the propane tank are now allowed without reservation or precedent. All proper permits and inspections must be done."

314. June 17, 1997: Plaintiff's attorney, Bruce Leiter, sends bill for filing the adjudicatory appeal of $1944.20.

315. June 24, 1997: Plaintiff's petition against the ZBA of Holland in Hampden Superior Court, docket number HDCV1996-71, brought relief. Judge Ford annulled the decision of the ZBA and granted plaintiff's summary judgment, and ordered that the matter be remanded to the ZBA for further consideration under the right section, c.40A,s.6.

316. Benjamin Haller, lawyer and chairman of ZBA, resigned before the adjudication of plaintiff's lawsuit.

317. August 5, 1997: Plaintiff files second petition for a special permit for a proposed 5' by 12' balcony with the ZBA.

318. August 11, 1997: Town clerk sends time stamped documents of petition back to plaintiff. The petition has been forwarded to the new chairman of ZBA, Robert Swift.

319. September 9, 1997: Public hearing with the ZBA on second petition on 5' by 12' balcony takes place. The board grants the special permit to build the proposed balcony.

320. September 11, 1997: ZBA sends letter with written decision, granting the special permit.

321. September 8, 1998: Building inspector issues building permit for proposed two-story garage. Signed copy of building permit application lists under item 28 and 29 that there will be plumbing in the two-story garage. Item 20 lists that the building will be heated. Item 22 lists no bedrooms.

322. July 12, 1999: Richard Cox reviews septic plan, adding the connection of the proposed two-story garage.

323. July 20, 1999: Plaintiff attends meeting with BOH and submits revised plans. this plans are the 8th sets of plans. The board wants to forward the plans to the town sanitarian, Mr. Quinn, for reviewing.

324. August 16, 1999: Mr. Quinn, BOH, sends letter by fax to Richard Cox instead of notifying plaintiff as required by statute, stating that the revised plans submitted by plaintiff on July 20, 1999 are unclear.

325. Plans are in conformance with all applicable provisions of 310 CMR 15.000. The request is arbitrary and capricious.

326. September 15, 1999: Forty-five day period in which the Board needs to act upon an application expires, board constructively granted permit for application, pursuant to M.G.L., c.111,s.31E.

327. Plaintiff had a constitutionally protected interest in the approval of his 8th plan for a subsurface sewage disposal system.

328. October 18, 1999: Plaintiff sends a registered letter to the BOH, informing them of the fact that they had constructively granted a permit, and requesting a signed copy of plaintiff's subsurface sewage disposal system plan.

329. October 19, 1999: Plaintiff learns for the first time of the letter faxed by Mr. Quinn to Richard Cox on August 16., 1999.

330. November 15, 1999: Plaintiff sends registered letter to the BOH, informing the BOH that they failed to notify him within the 45-day period, pursuant to M.G.L., c.111,s.31E, and also that notifying his engineer, Richard Cox, would fall short of their duty to notify the applicant as required under M.G.L., c.111,s.31E, since plaintiff is the applicant and not Richard Cox.

331. Plaintiff includes plan with the alteration of the system highlighted as requested by the BOH. This is the 9th set of plans.

332. December 31, 1999: Forty-five day period in which the Board needs to act upon an application expires for the second time on this application; thus, board constructively granted permit for application for the second time pursuant to M.G.L.,

      c.111,s.31E.

333. February 14, 2000: Plaintiff sends one more registered letter to the BOH, reminding the BOH again of their duty under M.G.L., c.111,s.31E, and that he is still waiting.

334. February 28, 2000: Memo from A. Quinn to BOH. titled "Review of existing plans & files of plaintiff of Maybrook Road on file." This Memo gives testimony to the skillfully orchestrated scheme of harassment by Sally Blais and other members of the BOH, creating a mess they conveniently are trying to blame on plaintiff.

335. March 21, 2000: In an attempt to institute public awareness of Sally Blais's, chairman of BOH, scheme of harassment and discrimination, plaintiff was accompanied by two well recognized members of the community, Mrs. Patty Foley, wife of Jim Foley, town selectman at that time, and Mr. Edward Voloka. Sally Blais is making the following claims:

336. claims she asked plaintiff for an "as built plan" back in 1996; (said document was mailed to BOH by plaintiff's engineer on June 22, 1995); denied ever having received the document; (another copy of said document was mailed or handed to BOH after this meeting; it was then allegedly lost again, see entry of March 21, 2001, then allegedly lost in the fire of the town hall in December of 1995, see entry of April 3, 2001);

337. claims nobody ever inspected the installed system in 1995 before the trenches were back-filled. Therefor nobody would really know what is in the ground, the system will have to be dug out to be inspected; (plaintiff's engineer, Richard Cox, has an entry in his field book; according to the record, the system was inspected by Maria Scott; plaintiff also remembers it clearly, since the system had to be inspected twice; the first time, the distribution box was installed the wrong way by Glen Hitchcock, the installer; the distribution box was then turned around 180 degrees and reinspected by Maria Scott the following day; the same parties attended the second inspection);

338. claims that she just joined the Board in 1996, did not know any better, that's why she did not stop plaintiff back then......(connecting the two-story garage to the subsurface sewage disposal system), and should not have signed the procedure sheet (see entry September 3, 1996). She also handed plaintiff a copy of a memo from Mr. Quinn, addressed to the BOH. In that memo, Mr. Quinn, under item 11, mentions the fact that the Board failed to sign of and failed to issue a certificate of compliance.

339. There is no mention of a missing "as built plan."

340. Of course Mr. Quinn does not use the word "failed." In all the prior correspondence from Mr. Quinn, there is no mention of

any outstanding documents from plaintiff's side.

341. Under item 16, Mr. Quinn claims that the BOH is still waiting for "resubmission" when in fact plaintiff resubmitted plans as requested, by certified mail and return receipt, on November 15, 1999. Sally Blais turned every thing around; in an accusatory, capricious way, she puts the blame on plaintiff. The purpose of the memo written by Mr. Quinn is unclear to plaintiff. Taken out of context, the memo leaves a negative impression; almost every item has some negative comment:

| | |
|---|---|
| item 1: | "no perk rate noted" |
| item 8: | "pumping prior to the septic tank is denied" |
| item 9: | ."..that it had denied the approval of the subsurface sewage disposal system.." |
| item 11: | "Certificate of Compliance not completed or signed off" |
| item 12: | "which is completely unacceptable to any board...." |
| item 14: | "The only way to determine that it was revised four times is by the four different dates on the plan. There is no way to determine what was done when, except to decipher the remarks of each revision." |
| item 16: | "we are still awaiting this resubmission." |

342. The meeting ended after Sally Blais asked plaintiff, "Are you telling me I am not doing my job ?" Plaintiff answered: "Yes." Thereafter, Sally Blais, chairman of the BOH, stormed out of the office. She did not return.

343. March 26, 2000: Letter from plaintiff to Richard Cox, informing Mr. Cox of his intention to attend the BOH meeting on April 4, 2000, and also sending him some copies of correspondence.

344. March 28, 2000: Richard Cox resubmits plans for the third time, with letter to Mr. Quinn. Mr. Cox references 310 CMR, s.15.301(5), which provides language that the proposed hook-up of the proposed garage is in accordance with title 5.

345. April 4, 2000: Plaintiff resubmits septic plans, and also files another copy of the allegedly never filed "as built" dated June 22, 1995. This is the 10th set of plans.

346. April 18, 2000: Mr. Quinn outlines his opinion in a letter, ignoring the provisions outlined in 310 CMR 15.00. Mr. Quinn states:

> "If calculations can show that the existing leach field has the capacity to accommodate this

      new structure (per the 1995 code), then the system can be approved)."

347. Formula to calculate system sewage flow has "number of bedrooms" as multiplier. As there were no additional bedrooms in the proposed garage, the flow according to 310 CMR 15.203 is unchanged and will not increase.

348. The same board signed the procedure sheet, see entry of September 3, 1996, agreeing to the hook-up of plaintiff's two-story garage, thus allowing the issuing of a building permit by the building inspector, for a building with plumbing.

349. May 1, 2000: Letter from Richard Cox, plaintiff's engineer, to Mr. Quinn, quoting the CMR again.

350. May 16, 2000: In an attempt of good faith, plaintiff files an affidavit with the registry of deeds, restricting the number of bedrooms on the property to two. 310 CMR 15.203(2) and 310 CMR 15.002 allows such a restrictive provision.

351. This is not a request of the BOH or a legal necessity, plaintiff volunteers to file such a document, in an additional attempt to find a solution and to offer members of the BOH a way to end the scheme of harassment and discrimination, without "losing face."

352. May 16, 2000: Plaintiff attends a meeting which is not really a meeting (no quorum); nobody else but Sally Blais is present. Plaintiff hands a copy of the affidavit plaintiff filed with the Registry of Deeds to Sally Blais. Sally Blais is insulting plaintiff, calling him a liar, questioning the authenticity of the copy of the document, and requesting to see a receipt. Prepared, plaintiff handed her a copy of the receipt. Then, Sally Blais explained that the receipt would only prove that plaintiff filed "something" which could be any thing.

353. June 12, 2000: Registry of Deeds sends original of Affidavit back to plaintiff with the book number 11195 and the page number 378 of said record.

354. June 19, 2000: Plaintiff sends a five page letter to the Board of selectmen, informing the members of said board of the situation with the BOH. The letter ends with the paragraph:

> "Over the last 13 years I spent over $18,000.00 and countless hours on capricious and malicious escapades of town officials, especially Humphrey Sutton, to get what the law allows me to have, it has to end, it has to end now, enough is enough!!!"

355. June 30, 2000: Selectman Jim Foley attends BOH meeting and discussed plaintiff's outstanding "Disposal System Construction Permit." In this document (minutes of meeting),

the "Disposal System Construction Permit" is incorrectly called "Letter of Compliance."

356. The minutes also state that Sally Blais requested from plaintiff the deed restriction, when in fact plaintiff filed this restriction on his own initiative and without prior knowledge by Sally Blais.

357. July 18, 2000: Plaintiff attends BOH meeting to obtain the outstanding "Certificate of Compliance" for the work done permitted under "Disposal Work Installer's Permit" which should have been a "Disposal System Construction Permit" number 040495, which was actually a date, April 4, 1995, and not a number, (changing a tight tank to a septic tank, addition of a leach field), and to obtain the "Disposal System Construction Permit" the Board approved by taking a vote, during the previous meeting of June 30, 2000.

358. The two members present told plaintiff, he should just go ahead and do it......, plaintiff would not need a paper (Disposal System Construction Permit), only installers would need a permit! Plaintiff insisted and explained to the members of the Board the difference between a "Disposal Work Installers permit" and a "Disposal System Construction permit." Plaintiff also showed the members of the Board the section 15.020 of 310 CMR, of his copy of 310 CMR 15.000 he brought to the meeting. Only then, one of the Board members telephoned Mr. Quinn, town sanitarian, and asked him what to do.

359. Finally, the two members present tried to find a blank copy of the document to be issued. After a while, one of the Board members found a form for the town of Sturbridge and filled it out.

360. Plaintiff's request for the above mentioned outstanding "Certificate of Compliance" was not granted at all, with the explanation that the BOH would issue a "Certificate of Compliance" for both applications as soon as the construction was finished and the final inspection done. Plaintiff insisted and again informed the present board members of his rights and the Board's duty pursuant to 310 CMR 15.021(3), but plaintiff's efforts were not rewarded, and the duty of the Board ignored.

361. October 2, 2000: Plaintiff sends a certified letter with the completed attachment "Installer's & Engineer's statement of compliance sign off form" to the BOH, with the request to send him the "certificate of compliance" for which plaintiff enclosed a self-addressed and stamped envelope.

362. October 31, 2000: The BOH issues faulty "Certificate of Compliance." There is a place on said form where the application number needs to be filled in. By doing so, the document is securely bound to the application that the "Certificate of Compliance" is referring to. The BOH failed to

Page 34 of 95 Pages

make that simple entry on the form, the document is vague and unclear. The document bears the following notes in hand writing: "Garage only" and "(Hookup)."

363. Sally Blais, chairman BOH, used a missing "Certificate of Compliance" as an excuse to delay reviewing plaintiff's application to connect the two-story garage for almost a year.

364. December 19, 2000: Plaintiff made a second attempt to get a "Certificate of Compliance" during a regular meeting with the BOH. During this meeting, Sally Blais responded to plaintiff's request for the still outstanding Certificate of Compliance:

   "you would like me to change that, wouldn't you ?..I bet you would!!..."

365. Sally Blais was referring to the certificate of compliance this board issued on October 31, 2000, for the alteration granted with permit number 071800-3 (connecting the garage to the existing subsurface sewage disposal system). She explained that she wrote the remark "For Garage only" on the "Certificate of Compliance" to make sure plaintiff would not change the garage into another dwelling. Plaintiff responded with disbelief and said that this would not make any sense, and the remark on the "Certificate of Compliance" would be very explicit and would also contain the remark "(Hookup)," and that there was no mentioning of a leach field or a change from a tight tank to a septic tank. Sally Blais than said to plaintiff, quote:

   "nothing makes sense to you!."

366. As the meeting did not meet the requirement for a quorum, there is no record of this incident. There are no minutes of this meeting either.

367. March 20, 2001: Plaintiff and his friend, Dave Chambers, attend another meeting with the BOH. Plaintiff is asking again for the outstanding "Certificate of Compliance." Sally Blais first responded, quote:

368. "Peter, I'm glad to do that for you."

369. She could not find the "as built" plan in her file, (the document she claimed she never got during the meeting which took place on March 21, 2000; another copy was then mailed or handed to her after that meeting. In her letter dated April 3, 2001, Sally Blais claims that the original of the "as built" was lost during a fire in December of 1995, in which the town hall was destroyed. After a while, Sally Blais gave up searching for the "as built" and she said, "without that 'as built' I can not help you!"

370. Plaintiff expected that she would find a way to hinder the issuance of the document again. Plaintiff handed a copy of a three page letter, dated March 19, 2001, he had prepared for

this expected outcome, to each member of the Board, before leaving the meeting.

371. This letter from plaintiff addressed to the BOH, requested again the issuance of the required "Certificate of Compliance," which Sally Blais and other members of the Board failed to issue, and which has been due since 1995.

372. April 3, 2001: Letter from Sally Blais, chairman BOH. Again she refuses to issue "Certificate of Compliance" and fails to take responsibility for the failure of the Board to issue such document Instead, she blames plaintiff and his engineer Richard Cox for the situation. Sally Blais accuses plaintiff of "not following the rules and regulations of Title V CMR 15.00 and the Bylaws of the Town of Holland until this Board required you to do so." Sally Blais further claims in that letter, "As of today 4/3/01, I am still waiting for a ruling from DEP and Town Council." Plaintiff has a constitutionally protected property interest in such "Certificate of Compliance."

373. February 19, 2002: PBH adopts unconstitutional policy for process of decision finding, which is also in violation of M.G.L. statutes. Minutes to the meeting of this day provide scienter-type evidence of such custom by the PBH officials having final policy-making authority.

374. April 15, 2002: Plaintiff signs contract "EXCLUSIVE RIGHT TO SELL LISTING AGREEMENT," with Sullivan & Wallace Real Estate, to sell lot "A" for the price or $ 100,000.

375. April 19, 2002: Robert Mildish and Tami Hayward-Mildish signed contract "OFFER TO PURCHASE AGREEMENT" on this day and therefore expressed their commitment to purchase lot "A" of plaintiff's 1st ANR plan for the price of $ 100,000.

376. May 7, 2002: Plaintiff, owner, and Rob and Tami Mildish, buyers of lot A, attended first informal meeting in regards to plaintiff's 1st ANR plan for a subdivision.

377. This voluntary participation of an informal meeting is not required and was a good faith attempt by the plaintiff and the buyers of said lot A to approach the PBH members with goodwill and benevolence.

378. Members of the Board, led by Earl Johnson, claimed that plaintiff would not be able to subdivide his parcel because he owned an adjoining nonconforming lot;

379. claimed that the nonconforming lot would have to have 200 feet frontage allotted along Maybrook Road;

380. plaintiff's property would not have a road with any legal standing and would be no more than a "driveway."

381. Earl Johnson, member of the Board and selectman, suggested

Page 36 of 95 Pages

that plaintiff should donate the property to the town to avoid paying taxes, as plaintiff would not be able to subdivide the property anyway.

382. The only way plaintiff could legally do it would be by constructing a road in compliance with the subdivision control bylaw of the town. Such a road would have to be 24 feet wide (pavement) with a circle at the end with a diameter of 100 feet.

384. This road would be approximately 850 feet long and serve 3 dwellings, two of which already exist.

385. As the parcel of land is peninsular, there would never be additional development or more traffic.

386. This 24' road serving three (3) dwellings would lead into Maybrook Road which is the only access road to serve dwellings on the west side of Hamilton Reservoir, approximately 230 dwellings. The pavement of Maybrook road is 14' to 16' wide.

387. May 7, 2002: Plaintiff showed to the attending members of the PBH a copy of a map titled, "Town of Holland Board of Assessors Map numbered R 40." The actual subdivision plan was not drawn yet. Plaintiff altered said map, to show the approximate property lines of proposed Lot A.

388. Defendant(s) raised issues and asserted facts which did not have any base in law or equity. From the beginning, the Board members' conduct showed clearly a discriminatory animus against the plaintiff and his ANR subdivision.

389. May 21, 2002: Plaintiff, owner, and Rob and Tami Mildish, buyers, attended second informal meeting. Plaintiff handed each member of the PBH, defendant(s), a copy of a document consisting of 8 pages of case law, addressing issues brought up by the defendant(s) during the first meeting, the meeting of May 7.

390. In another ill motivated attempt to sabotage and squash plaintiffs 1st ANR plan application, and consistent with other actions by the PBH members, PBH members handed a document to plaintiff with a list of four (4) case notes that the members of the Board claimed would apply to plaintiff's parcel.

391. Three cases deal with issues like wetland and do not apply at all, the Board members emphasized on the remaining note on the case, Gallitano v. Board of Survey & Planning of Waltham, 10 Mass. App. Ct. 269 (1980), which provides:

> "[a]s a rule of thumb, practical access exists where the buildable portion of each lot is connected to the required frontage by a strip of land not narrower than the required frontage at any point, measured from that point to the nearest point of the opposite sideline."

392. The required frontage in Waltham at that time was 20 feet, in Holland where plaintiff's parcel is located, the required frontage is 10 times more, that is, two hundred (200) feet. Gallitano obviously supports plaintiff's 1st and 2nd ANR plan.

394. The introduction of this document is a deliberate discriminatory arbitrary act geared towards squashing plaintiff's 1st ANR.

395. The Gallitano case offers by its description no assistance to the defendants; to the contrary, the case supports an endorsement of plaintiff's 1st and 2nd ANR plan.

396. During a deposition of Debra Benveniste, plaintiff established the fact that Debra Benveniste never read the case. Debra Benveniste and Earl Johnson and other members in furtherance of the conspiracy, guided by animus, introduced this document into the proceeding to actively sabotage plaintiff's 1st ANR plan with the intent to retaliate, harass and discriminate.

397. June 4, 2002: Plaintiff, Rob and Tami Mildish, buyers, attempted to file a copy of plaintiff's formal application for his 1st ANR plan with Robert H. Ford, town clerk, pursuant to M.G.L., c.41,s.81T.

398. In violation of M.G.L., c.41,s.81T, the town clerk refused to accept plaintiff's 1.ANR with the comment:

   "I don't want to get involved!."

399. Plaintiff showed town clerk page 17-16, paragraph 17.24, Massachusetts Zoning Manual, Volume II, edited by Martin R. Healy, MCLE Book series, describing the procedure for securing a 81P endorsement. Mr. Ford stood firm and still refused.

400. This refusal by Robert Ford, town clerk, delayed the application by fourteen (14) days and was improper and a denial of "procedural and substantive due process." The scheduled meeting of the PBH for this date was canceled without prior notice.

401. June 18, 2002: Plaintiff and Rob and Tami Mildish, buyers, attended the third meeting and handed Debra Benveniste, chairman PBH, document "Memorandum in support of request for endorsement of ANR plan under G.L.c.41,s.81P," with attachments consisting of 19 (nineteen) pages and 1 (one) set of color prints, addressing issues brought up by the defendant(s) during the meeting of May 21, 2002.

402. The defendant(s) then brought up old issues again. Plaintiff submitted formal application of his 1st ANR plan, titled "Plan of land in Holland, Mass. prepared for plaintiff, owner," dated June 3, 2002, seeking endorsement and certification pursuant to M.G.L., c.41,s.81X.

403. Minutes to the PBH meeting of this day include the record that members of the Board will discuss plaintiff's 1st ANR plan with the town attorney, Vincent McCaughey.

404. Members of the Board did not take any action during the meeting and asked plaintiff to come back for the next regular meeting.

405. June 18, 2002: Plaintiff's 1st ANR plan, as submitted to the Board on this day, was in compliance with all applicable requirements and regulations, such as M.G.L. and Zoning By-laws of the town of Holland.

406. Members of the PBH had no discretion in deciding plaintiff's application.

407. Endorsement of plaintiff's 1st ANR plan by the PBH was mandatory according to M.G.L., c.41,s.81P.

408. Plaintiff had a constitutionally protected property interest in the endorsement of his 1st ANR plan.

409. June 22, 2002: Two juveniles break into a vacant summer cottage and a storage shed on plaintiff's property. Plaintiff witnessed one of the juveniles throwing a brick through a window. Plaintiff calls 911 with his cell phone, holding on to one of the juveniles. Kevin Gleason, at that time a police officer of the Holland police department, now Chief of police in Holland, one other officer of the Holland police department and two police officers of the Brimfield Police department arrested the two juveniles after they confessed that they broke the lock to a shed and burglarized the shed and the house, located on plaintiff's property, looking for "usable stuff."

410. June 24, 2002: Debra Benveniste wrote letter denying plaintiff's 1st ANR plan application of his parcel, deed book 7120, page 529, without prior "final action" by the PBH members, in violation of the open meeting law M.G.L., c.39,s.23B, and provisions of M.G.L., c.41,s.81P.

411. June 25, 2002: Plaintiff files four page "voluntary statement" with the Holland Police and presses criminal charges for trespassing, breaking in and entering (two counts, house and shed), theft, damaging and destroying of property against both juvenile suspects.

412. Sometime before July 2, 2002: Without notifying the plaintiff, the members of the PBH conducted a visual inspection of the private way on plaintiff's property mentioned in the minutes to the meeting of July 2, 2002, and also in the testimony of Debra Benveniste during her deposition of October 16, 2003. This constitutes a violation of due process.

413. July 2, 2002: Plaintiff, owner, and Rob and Tami Mildish, buyers, are attending the fourth meeting with the PBH.

414. Without taking a formal vote during the meeting, (final action), the defendant(s) inform plaintiff of their illegal and preordained decision, i.e., refusing plaintiff's 1st ANR plan application.

415. This constitutes violation of M.G.L., c.41,s.81P, and M.G.L., c.39,s.23B. The members of the planning board imposed conditions not authorized by M.G.L. and local ordinance to plaintiff's 1st ANR plan; such as the condition of a private way which is located on said parcel of land, and does not need to provide any frontage to the newly created lot, lot A; such as topographical condition which is located outside the newly created lot (condition is incorrectly stated), violation of M.G.L., c.41,s.81Q; such as further development outside newly created lot.

416. Plaintiff has a constitutionally protected property interest in the endorsement of his 1st ANR subdivision plan application.

417. Plaintiff's 1st ANR plan is in compliance with all applicable statutes of M.G.L., local bylaws, regulations and requirements, and this entitlement amounts to a constitutionally protected property interest granted under U.S.C.A. Const. Amend. 14.

418. The minutes to the meeting give testimony to the capricious arbitrary arguments the PBH based its decision on:

> "We believe that the division would make a nonconforming lot more nonconforming."

There is nothing "nonconforming" about the lot, and the 1st ANR plan would not change this fact!

419. Further:

> "What Mr. Frei refers to as a private road appears on visual inspection to be more of a very poorly maintained driveway. This is the only access to the public way, Maybrook Road."

The lot created by plaintiff's 1st ANR plan, (lot A), has more than 200 feet of frontage along Maybrook Road and does not depend on or use the private way mentioned in the minutes. Testimony to this fact was given reluctantly by Earl Johnson, member of the PBH, during his deposition on December 30, 2002, when he admitted that the private way had nothing to do with the newly created lot A, and lot A did not depend on any frontage along said private way.

420. Further:

> "At points, the property measures approximately 10 feet wide with steep drop offs to Hamilton

Page 40 of 95 Pages